Nos. 24-2527, 24-3786

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

PACIFIC GAS AND ELECTRIC COMPANY, *et al.*

*Petitioners*,

v.

FEDERAL ENERGY REGULATORY COMMISSION,

*Respondent.*

On Petition for Review of Final Orders of the Federal Energy
Regulatory Commission

**BRIEF OF PETITIONERS PACIFIC GAS AND ELECTRIC COMPANY,
SOUTHERN CALIFORNIA EDISON COMPANY, AND
SAN DIEGO GAS & ELECTRIC COMPANY**

Charles Middlekauff
PACIFIC GAS AND ELECTRIC COMPANY
300 Lakeside Drive
Oakland, CA 94612
Telephone: (650) 766-9147
charles.middlekauff@pge.com

Rebecca Furman
SOUTHERN CALIFORNIA EDISON COMPANY
2244 Walnut Grove Ave.
Rosemead, CA 91770
Telephone: (626) 302-3475
rebecca.furman@sce.com

Ross Fulton
SAN DIEGO GAS & ELECTRIC COMPANY
8330 Century Park Court
San Diego, CA 92123
Telephone: (858) 654-1861
rfulton@sdge.com

Matthew E. Price
Arjun R. Ramamurti
JENNER & BLOCK LLP
1099 New York Ave. NW Suite 900
Washington, DC 20001
Telephone: (202) 639-6000
mprice@jenner.com
aramamurti@jenner.com

Laurie Edelstein
JENNER & BLOCK LLP
525 Market Street, 29th Floor
San Francisco, CA 94105
Telephone: (628) 267-6800
ledelstein@jenner.com

*Counsel for Petitioners Pacific Gas and
Electric Company, Southern California
Edison Company, and San Diego Gas &
Electric Company*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, Petitioners submit the following disclosure statement:

Pacific Gas and Electric Company is a subsidiary of PG&E Corporation, a publicly held corporation. No publicly held corporation has a 10 percent or greater ownership interest in PG&E Corporation.

Southern California Edison Company is a subsidiary of Edison International, a publicly held corporation. As of February 29, 2024, BlackRock, Inc., a publicly held corporation, beneficially owned 10 percent or more of Edison International's common stock. No other publicly held corporation beneficially owns 10 percent or more of Edison International's common stock.

San Diego Gas & Electric Company is a subsidiary of Sempra, a publicly held corporation. As of December 31, 2023, BlackRock, Inc., a publicly held corporation, beneficially owned 10 percent or more of Sempra's common stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF AUTHORITIES ................................................................. iv

GLOSSARY................................................................................x

INTRODUCTION ..........................................................................1

JURISDICTIONAL STATEMENT ............................................................5

STATUTORY AND REGULATORY AUTHORITIES ..........................................5

ISSUES PRESENTED......................................................................6

STATEMENT OF THE CASE ..............................................................6

I.      STATUTORY AND REGULATORY BACKGROUND .............................6

      A.    Federal Jurisdiction Over the Interstate Transmission System and Regional Transmission Organizations............................7

      B.    Federal Incentives for Capital Investment to Improve Transmission Efficiency and Reliability.............................10

           1.    Section 219.................................................10

           2.    Order No. 679 ..............................................12

II.    CALIFORNIA'S REGULATION OF RTO MEMBERSHIP .....................15

      A.    Petitioners' Voluntary RTO Participation............................15

      B.    This Court Confirms That PG&E Was Entitled to the RTO Adder. ................................................................18

      C.    California's Revision of Section 362. .................................20

III.   THE PRESENT DISPUTE........................................................22

      A.    FERC's December 29, 2023 Order ("Initial Order")..........................22

      B.    Petitioners' Rehearing Requests.........................................23

      C.    The June 12, 2024 Order ("Rehearing Order")....................................25

STANDARD OF REVIEW .................................................................28

SUMMARY OF ARGUMENT .............................................................28

ARGUMENT ..............................................................................31

I.      CALIFORNIA LAW PERMITS UTILITIES TO WITHDRAW FROM CAISO. ................................................................31

A.      AB 209 Allows Withdrawal From CAISO with CPUC
        Approval. ........................................................................32

B.      The Need to Seek Regulatory Approval Does Not Make an
        Action Involuntary. ........................................................38

II.     FERC'S ORDERS MUST BE VACATED BECAUSE CONGRESS
        PREEMPTED STATE LAWS MANDATING RTO MEMBERSHIP. .......43

A.      Section 362(c) Is Field Preempted. ....................................43

B.      Section 362 Is Conflict Preempted......................................47

C.      The Commission Arbitrarily Declined to Answer the
        Preemption Question. ......................................................49

III.    FERC'S DENIAL OF THE ADDER IS CONTRARY TO THE
        UNAMBIGUOUS TEXT OF SECTION 219(c). ...............................51

A.      A Voluntariness Requirement Conflicts with the Plain Text of
        Section 219(c)...............................................................51

B.      FERC's Contrary Reasoning Is Unpersuasive. ...................56

C.      Even Assuming Section 219 Includes a Voluntariness
        Requirement, PG&E Did "Join" Voluntarily.......................59

CONCLUSION ........................................................................60

# TABLE OF AUTHORITIES

## CASES

*Arizona v. United States*, 567 U.S. 387 (2012) .................................................44

*Application of San Diego Gas & Electric Company (U902E)*, D.11-05-048, 2011 WL 2246056 (Cal. P.U.C. May 26, 2011) .........................................41

*Assurance Wireless USA, L.P. v. Reynolds*, 100 F.4th 1024 (9th Cir. 2024) ......................................................................................................................43

*Atlantic City Electric Co. v. FERC*, 295 F.3d 1 (D.C. Cir. 2002) ..............10, 41, 48

*California Public Utilities Commission v. FERC*, 20 F.4th 795 (D.C. Cir. 2021) ......................................................................................................40

*California Public Utilities Commission v. FERC*, 29 F.4th 454 (9th Cir. 2022) ................................................................. 17, 19, 20, 21, 28, 35, 36, 46, 59

*California Public Utilities Commission v. FERC*, 879 F.3d 966 (9th Cir. 2018) .................................................................15-19, 22, 27, 28, 39, 42, 57-59

*California Public Utilities Commission*, 132 FERC ¶ 61,047 (2010) .....................50

*Chamber of Commerce of the United States v. Bonta*, 62 F.4th 473 (9th Cir. 2023) .............................................................................................47

*Chambers v. Miller*, 140 Cal. App. 4th 821 (2006) ..............................................35

*Copley Press, Inc. v. Superior Ct.*, 39 Cal. 4th 1272 (2006) ...................................34

*Crosby v. National Foreign Trade Council*, 530 U.S. 363 (2000) ..........................47

*Dayton Power & Light Co.*, 176 FERC ¶ 61,025 (2021) ........................................55

*Duke Energy Trading & Marketing, L.L.C. v. Davis*, 267 F.3d 1042 (9th Cir. 2001) ......................................................................................................44, 45

*FPC v. Florida Power & Light Co.*, 404 U.S. 453 (1972) .......................................16

*FPC v. Hope Natural Gas Co.*, 320 U.S. 591 (1944) ................................................7

*FERC v. Electric Power Supply Ass'n*, 577 U.S. 260 (2016) ..............................6, 19

*Gade v. National Solid Wastes Management Ass'n*, 505 U.S. 88 (1992) ................................................................................47

*Grassi v. Superior Court*, 73 Cal. App. 5th 283 (2021) .............................37

*Hodges v. Comcast Cable Communications, LLC*, 21 F.4th 535 (9th Cir. 2021) ................................................................................28

*Hughes v. Talen Energy Marketing, LLC*, 578 U.S. 150 (2016) .............9, 44, 45, 46

*Illinois Commerce Commission v. FERC*, 721 F.3d 764 (7th Cir. 2013) ...........3, 48

*International Transmission Co. v. FERC*, 988 F.3d 471 (D.C. Cir. 2021) ................................................................................54

*ISO New England, Inc.*, 109 FERC ¶ 61,147 (2004) ........................................10, 40

*Jama v. ICE*, 543 U.S. 335 (2005) ................................................................53

*Joint Application of California-American Water Company (U210W) and Warring Water Service, Inc. (U331W)*, D.22-08-005, 2022 WL 3910231 (Cal. P.U.C. Aug. 4, 2022) ................................41

*Joint Application of Pacific Gas & Electric Co.*, D.98-01-053, 1998 WL 242747 (Cal. P.U.C. Jan. 21, 1998)...............................16-21, 32-36, 38, 55

*Kurns v. Railroad Friction Products Corp.*, 565 U.S. 625 (2012) ........................43

*Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024) .................28, 51, 57

*Louisville Gas & Electric Co. v. LG&E Energy LLC*, 114 FERC ¶ 61,282 (2006) ................................................................................10

*Maine Community Health Options v. United States*, 590 U.S. 296 (2020)................................................................................52

*MCI Worldcom Network Services, Inc. v. FCC*, 274 F.3d 542 (D.C. Cir. 2001) ................................................................................40

*Midcontinent Independent System Operator Inc.*, 150 FERC ¶ 61,004 (2015)................................................................................15

*Midwest Power Systems Inc.*, 78 FERC ¶ 61,067 (1997) ........................................50

v

*Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29 (1983)...........................49

*National Shooting Sports Foundation, Inc. v. California*, 5 Cal. 5th 428 (2018)...........................................................................................37

*New England Ratepayers Ass'n*, 168 FERC ¶ 61,169 (2019) ........................... 49-50

*New York v. FERC*, 535 U.S. 1 (2002) .......................................................45

*Newman v. Chater*, 87 F.3d 358 (9th Cir. 1996) .......................................52

*Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373 (2015)...............................43, 46

*Order Instituting Rulemaking on Commission's Proposed Policies Governing Restructuring California's Electric Service Industry and Reforming Regulation*, D.95-12-063, 1995 WL 792086 (Cal. P.U.C. Jan. 10, 1996)...........................................................................15

*Pacific Gas & Electric Co.*, 148 FERC ¶ 61,245 (2014)...........................18

*Pacific Gas & Electric Co.*, 152 FERC ¶ 61,252 (2015)...........................18

*Pacific Gas & Electric Co.*, 168 FERC ¶ 61,038 (2019)...........................19

*People v. Gutierrez*, 58 Cal. 4th 1354 (2014)........................................38

*People v. Moroney*, 24 Cal. 2d 638 (1944)...........................................34

*PPL Electric Utilities Corp.*, 123 FERC ¶ 61,068 (2008).......................15

*Promoting Transmission Investment Through Pricing Reform*, Order No. 679, 116 FERC ¶ 61,057 (2006), *order on reh'g*, Order No. 679-A, 117 FERC ¶ 61,345 (2006), *order on reh'g*, Order No. 679-B, 119 FERC ¶ 61,062 (2007)................................12, 13, 14, 57, 58

*Promoting Transmission Investment Through Pricing Reform*, Order No. 679-A, 117 FERC ¶ 61,345 (2006), *order on reh'g*, Order No. 679-B, 119 FERC ¶ 61,062 (2007)................................14, 15, 58

*Regional Transmission Organizations*, Order No. 2000, 89 FERC ¶ 61,285, 1999 WL 33505505 (1999).........................3, 4, 9, 11, 48

*San Diego Gas & Electric Co.*, 118 FERC ¶ 61,073 (2007) ...................17

*San Diego Gas & Electric Co.*, 143 FERC ¶ 61,246 (2013) ...................................17

*San Diego Gas & Electric Co. v. FERC*, 913 F.3d 127 (D.C. Cir. 2019) ........................................................................................................54

*South Carolina Public Service Authority v. FERC*, 762 F.3d 41 (D.C. Cir. 2014) ..................................................................................44, 47

*Southern California Edison Co.*, 121 FERC ¶ 61,168 (2007) ...................................17

*Transmission Agency of Northern California v. Sierra Pacific Power Co.*, 295 F.3d 918 (9th Cir. 2002) ..........................................................8, 44

*Viridon California LLC*, 186 FERC ¶ 61,143 (2024) ...................................55

*Wilderness Watch, Inc. v. United States Fish & Wildlife Service*, 629 F.3d 1024 (9th Cir. 2010) .............................................................50

*Yeager v. Blue Cross of California*, 175 Cal. App. 4th 1098 (2009) ...................35

**STATUTES**

16 U.S.C. § 824(b) ..............................................................................45

16 U.S.C. § 824(b)(1) ..................................................................7, 29, 44

16 U.S.C. § 824a(a).................................. 2, 3, 8, 9, 29, 45, 47, 48

16 U.S.C. § 824d ..............................................................................50

16 U.S.C. § 824d(a) ....................................................................2, 8, 46

16 U.S.C. § 824e ..............................................................................50

16 U.S.C. § 824o(a)(6) ..........................................................................11

16 U.S.C. § 824s ..............................................................................10

16 U.S.C. § 824s(a).....................................................................4, 10, 56

16 U.S.C. § 824s(b)(1) .................................................................2, 11, 30

16 U.S.C. § 824s(b)(2) ......................................................11, 30, 31, 54, 56

16 U.S.C. § 824s(b)(3) .............................................................11, 54, 56

16 U.S.C. § 824s(c) ..................................................... 1, 4, 6, 11, 30, 51, 59

16 U.S.C. § 824s(d) ...................................................................... 13, 55

16 U.S.C. § 825*l*(b) ............................................................................ 5

Cal. Pub. Util. Code § 330 ................................................................ 15

Cal. Pub. Util. Code § 362(c) ...................................... 1, 20, 33, 34, 36, 45

Cal. Pub. Util. Code § 362(d) ........................................................... 20

Cal. Pub. Util. Code § 365 ................................................................ 15

Cal. Pub. Util. Code § 399.14(a)(1) ................................................... 39

Cal. Pub. Util. Code § 454 ................................................................ 39

Cal. Pub. Util. Code § 454.5 ............................................................. 39

Cal. Pub. Util. Code § 564 ................................................................ 39

Cal. Pub. Util. Code § 740.18 ........................................................... 39

Cal. Pub. Util. Code § 851 ........................... 16, 17, 19-21, 23, 26, 32-36, 38, 39, 41

Cal. Pub. Util. Code § 851(a) ....................................................... 16, 39

Cal. Pub. Util. Code § 852 ................................................................ 39

Cal. Pub. Util. Code § 8388.5 ........................................................... 39

**LEGISLATIVE MATERIALS**

AB 209, Ch. 251 of the Statutes of 2022 (Cal. eff. Sept. 6, 2022) ........ 20, 21, 32, 35

**OTHER AUTHORITIES**

18 C.F.R. § 35.34(f) ....................................................................... 9

18 C.F.R. § 35.34(k)(7) ................................................................... 9

18 C.F.R. § 35.35(b)(2) .................................................................. 11

Brief of FERC, *California Public Utilities Commission v. FERC*, No. 16-70481 (9th Cir. Sept. 19, 2016), 2016 WL 5391636......................................39

*CAISO Amended and Restated Transmission Control Agreement*, § 3.3.3, https://www.caiso.com/documents/transmissioncontrol agreement.pdf..............................................................................................10, 41

Complaint and Petition for Declaratory Order, *Cal. Pub. Utils. Comm'n v. San Diego Gas & Electric*, Docket No. EL24-115 (F.E.R.C. May 31, 2024), https://elibrary.ferc.gov/eLibrary/filelist?accession_ number=20240531-5455...................................................................................37

Each, *Collins English Dictionary*, https://collinsdictionary.com/us/dic tionary/english/each (last visited Sept. 4, 2024)...................................................52

FERC, *Formula Rates in Electric Transmission Proceedings*, https:// www.ferc.gov/formula-rates-electric-transmission-proceedings- key-concepts-and-how-participate (last updated July 5, 2022)............................7

Join, *Collins English Dictionary*, https://www.collinsdictionary.com/ us/dictionary/english/join (last visited Sept. 4, 2024) ........................................53

# GLOSSARY

| | |
|---|---|
| **1998 Transfer Decision** | *Joint Application of Pacific Gas & Elec. Co.*, D.98-01-053, 1998 WL 242747 (Cal. P.U.C. Jan. 21, 1998) |
| **CAISO** | California Independent System Operator Corporation |
| ***CPUC I*** | *CPUC v. FERC*, 879 F.3d 966 (9th Cir. 2018) |
| ***CPUC II*** | *CPUC v. FERC*, 29 F.4th 454 (9th Cir. 2022) |
| **FERC** | Federal Energy Regulatory Commission |
| **FPA** | Federal Power Act |
| **Initial Order** | 185 FERC ¶ 61,243 (Dec. 29, 2023) |
| **ISO** | Independent System Operator |
| **PG&E** | Pacific Gas and Electric Company |
| **Rehearing Order** | 187 FERC ¶ 61,167 (June 12, 2024) |
| **RTO** | Regional Transmission Organization |
| **SCE** | Southern California Edison Company |
| **Section 219** | 16 U.S.C. § 824s(c) |
| **Section 362(c)** | California Public Utilities Code Section 362(c) |
| **SDG&E** | San Diego Gas & Electric Company |

## INTRODUCTION

Under the Federal Power Act ("FPA"), utilities "that join[]" a regional transmission organization ("RTO") are eligible for a federal rate incentive, known as an "adder." *See* FPA § 219(c), 16 U.S.C. § 824s(c). Petitioner Pacific Gas and Electric Company ("PG&E") had received the adder since 2007. Recently, however, the Federal Energy Regulatory Commission ("FERC") unlawfully held that PG&E no longer is entitled to the adder because: (1) only voluntary members of an RTO are eligible for the adder; and (2) PG&E is no longer a voluntary member due to a new California law that FERC interpreted to require PG&E's RTO membership. *See* Cal. Pub. Util. Code § 362(c) ("Section 362(c)"). FERC was wrong for three independent reasons.

First, FERC erred in interpreting Section 362(c) to make PG&E's RTO participation involuntary. FERC's rehearing order interpreted the statute to prohibit PG&E's withdrawal from RTO participation, even with approval of the California Public Utilities Commission ("CPUC"). That interpretation, however, is contrary to the plain statutory text. In revising Section 362(c), the legislature sought to ratify authority the CPUC had longed claimed to review applications to join or withdraw from RTOs. Indeed, even the CPUC does not appear to share the interpretation in FERC's rehearing order. Under a correct reading of Section 362(c), PG&E is free to withdraw from RTO participation subject to regulatory approval.

1

Prior to the rehearing order, FERC took a different position, agreeing with PG&E's reading of Section 362(c) but holding that PG&E's participation nevertheless was involuntary because PG&E could not "*unilaterally* withdraw" from the RTO. But, as Petitioners argued on rehearing, the need to obtain CPUC approval before withdrawing does not mean that PG&E's continued membership is involuntary. After all, regulatory approval is routinely required for actions utilities seek to undertake, but the decision whether to take such actions and seek necessary approvals is still voluntary. Indeed, FERC itself reviews utilities' requests to withdraw from RTOs, yet does not believe that the need to obtain FERC approval makes utilities' participation in RTOs involuntary.

Second, even if Section 362(c) did purport to require RTO membership, it was arbitrary and capricious for FERC to rely on that state statute to deny PG&E the adder because, under the FPA and the Supremacy Clause, states have no power to compel utilities to join RTOs. FERC has exclusive federal jurisdiction over transmission facilities in interstate commerce and the creation of RTOs, and it has exclusive jurisdiction to ensure that transmission owners charge just and reasonable rates. *See* 16 U.S.C. §§ 824(b)(1), 824a(a), 824d(a). If Section 362(c) were interpreted to mandate that utilities join and remain in RTOs—which entails giving the RTO operational control over the utility's federally regulated transmission

2

facilities—Section 362(c) would be field preempted because it intrudes on the federal government's exclusive jurisdiction over transmission facilities.

Moreover, Congress determined that the interconnection and coordination of interstate electric transmission facilities should be "voluntary." 16 U.S.C. § 824a(a). Consistent with Congress' directives, FERC has refused to compel utilities to join RTOs, instead reiterating the importance of a "voluntary approach." *Regional Transmission Organizations*, Order No. 2000, 89 FERC ¶ 61,285, 1999 WL 33505505, at *3 (1999) ("Order No. 2000"); *see also Ill. Com. Comm'n v. FERC*, 721 F.3d 764, 776 (7th Cir. 2013). If Section 362(c) were interpreted to mandate RTO membership, it would be conflict preempted because it makes mandatory what Congress commanded should be voluntary.

FERC declined to consider this issue, asserting that preemption is for federal courts to decide. But that misunderstands Petitioners' argument. Petitioners are challenging *FERC's* decision applying FPA Section 219(c). Congress cannot have intended for FERC, in implementing Section 219(c), to give decisive weight to a state law that Congress preempted elsewhere in the FPA. Thus, FERC acted arbitrarily and capriciously in refusing even to consider whether the FPA preempted the state statute that formed the entire basis for its rate decision. In any event, this Court is fully capable of deciding the issue, and should hold that FERC's reliance on California's Section 362(c) was contrary to the FPA.

Third, even standing alone, Section 219(c)'s plain text does not allow FERC to distinguish between utilities that join an RTO voluntarily rather than by state mandate. 16 U.S.C. § 824s(c). Section 219(c) states that FERC "*shall* … provide for incentives to *each* transmitting utility or electric utility *that joins* a Transmission Organization." *Id.* (emphases added). The statute is clear that the adder *must* be given to *any* utility *that joins* an RTO, whether it does so freely or by compulsion.

That conclusion makes sense given the broader statutory context of Section 219. Congress generally authorized FERC to establish a variety of "incentive-based … rate treatments" for "the purpose of benefitting consumers by ensuring reliability and reducing the cost of delivered power by reducing transmission congestion." *Id.* § 824s(a). The incentive awarded under Section 219(c)—an additional 0.50% return on equity for transmission investment—enhances the attractiveness of transmission investments, compared to other potential utility investments, by easing access to capital for transmission investments and incentivizing the deployment of that capital for transmission system improvements. And incentivizing transmission investment by RTO members in particular helps ensure that such investment is made efficiently because RTOs exist to "improve efficiencies in the management of the transmission grid" and "improve grid reliability." Order No. 2000, 1999 WL 33505505, at *29. FERC's position, however, undermines Congress' goal by removing the incentive for RTO members

4

to invest more money in transmission when their membership is mandated by state law.

For each of these reasons, this Court should grant the petitions for review and vacate FERC's orders.

## JURISDICTIONAL STATEMENT

FERC had jurisdiction over the case below pursuant to 16 U.S.C. § 824d. FERC issued its initial order denying the adder on December 29, 2023. 185 FERC ¶ 61,243 (Dec. 29, 2023) ("Initial Order"). Petitioners timely requested rehearing on January 29, 2024. FERC issued a Notice of Denial of Rehearing By Operation of Law and Providing for Further Consideration. 186 FERC ¶ 62,096 (Feb. 29, 2024). Petitioners timely filed a petition for review in this Court on April 22, 2024 (No. 24-2527). FERC issued a substantive order on rehearing on June 12, 2024. 187 FERC ¶ 61,167 (June 12, 2024) ("Rehearing Order"). Petitioners timely filed a petition for review in this Court on June 18, 2024 (No. 24-3786). The cases were consolidated on July 5, 2024. This Court has jurisdiction and venue to review these FERC orders because the "public utility to which the order[s] relate[]" is located within this Circuit. 16 U.S.C. § 825*l*(b).

## STATUTORY AND REGULATORY AUTHORITIES

Pertinent statutory and regulatory authorities appear in an Addendum.

5

## ISSUES PRESENTED

1.     Whether FERC acted arbitrarily, capriciously, or contrary to law in concluding that Section 362(c) renders PG&E's RTO participation involuntary.

2.     Whether FERC acted arbitrarily, capriciously, or contrary to law in concluding that PG&E's RTO participation is involuntary based on Section 362(c), ignoring that Section 362(c) is preempted by the FPA.

3.     Whether FERC acted contrary to law in denying PG&E's adder when Section 219(c) of the FPA provides that FERC "*shall* … provide for incentives to *each* transmitting utility or electric utility *that joins* a Transmission Organization." 16 U.S.C. § 824s(c) (emphases added).

## STATEMENT OF THE CASE

## I.     STATUTORY AND REGULATORY BACKGROUND

Electricity generally is produced and delivered to customers in three steps: generation, transmission, and distribution.  Power plants generate electricity that is transmitted over long distances at high voltage to substations and ultimately distributed to end-use customers on local distribution wires.  *See FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 265-68 (2016).

Petitioners PG&E, Southern California Edison Company ("SCE"), and San Diego Gas & Electric Company ("SDG&E") are California's three largest investor-owned electric utilities.  Regulated utilities like Petitioners earn a return for investors

on the capital they invest in the electric generation, transmission, and distribution infrastructure (like poles, wires, and substations) that delivers electricity to the public. In raising capital from investors and lenders, utilities compete with other businesses (both regulated and non-regulated) for that capital. Utilities are permitted by regulators to charge rates that are calculated to allow for the recovery of their costs plus an authorized return on invested capital that compensates investors and lenders for the use of their funds. The authorized return for investors is called the return on equity ("ROE") and is a percentage rate applied to the total amount of equity invested in serving customers.[1]

## A. Federal Jurisdiction Over the Interstate Transmission System and Regional Transmission Organizations

Under the FPA, states generally have jurisdiction over requirements and rates for electric generation and distribution, while FERC has jurisdiction over requirements and rates for electric transmission. 16 U.S.C. § 824(b)(1).

This case concerns electric transmission. The FPA provides that FERC "shall have jurisdiction over all facilities for" the "transmission of electric energy in interstate commerce." *Id.* FERC is also tasked with reviewing and approving the rates transmission owners charge for transmitting energy to ensure they are "just and

---

[1] *See generally* FERC, *Formula Rates in Electric Transmission Proceedings*, https://www.ferc.gov/formula-rates-electric-transmission-proceedings-key-concepts-and-how-participate (last updated July 5, 2022); *FPC v. Hope Nat. Gas Co.*, 320 U.S. 591, 603 (1944).

reasonable." *Id.* § 824d(a). FERC's jurisdiction over these fields is exclusive. *Transmission Agency of N. Cal. v. Sierra Pac. Power Co*., 295 F.3d 918, 928 (9th Cir. 2002).

In the 1990s, FERC recognized that electricity could be delivered to customers more efficiently and reliably if transmission were coordinated at the regional level by a neutral grid operator. Regional supervision of the interstate grid, too, is a domain that Congress has long reserved to FERC. "For the purpose of assuring an abundant supply of electric energy throughout the United States with the greatest possible economy," Congress provided that FERC "is empowered and directed to divide the country into regional districts for the *voluntary* interconnection and coordination of facilities for the … transmission … of electric energy." 16 U.S.C. § 824a(a) (emphasis added). Congress emphasized that it "shall be the duty of [FERC] to promote and encourage such interconnection and coordination within each such district." *Id.* Congress made clear that states could play at most a consultative role in this arena, requiring only that FERC "afford" each affected state commission a "reasonable opportunity to present its views and recommendations." *Id.*

In 1999, drawing in part on this authority, FERC issued Order No. 2000. That order established the minimum criteria for the "regional transmission organizations" and "independent system operators" ("ISOs") that would operate the transmission

system and plan new transmission projects to ensure reliability and relieve congestion on the interstate grid. *See* Order No. 2000, 1999 WL 33505505, at *2-3; *Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 155 (2016); *Elec. Power Supply Ass'n*, 577 U.S. at 267-68.[2] Consistent with Congress' focus on "voluntary interconnection," 16 U.S.C. § 824a(a), Order No. 2000 expressly refused to require utilities that owned or operated interstate transmission facilities to join RTOs or ISOs. *See, e.g.*, Order No. 2000, 1999 WL 33505505, at *43-49, *59. Instead, FERC adopted a "voluntary approach" and an "open collaborative process that relies on voluntary regional participation to design RTOs that can be tailored to specific needs of each region." *Id.* at *2-4.

Allowing the utility to decide whether to join an RTO was sensible policy, in addition to being required under the FPA. *See* 16 U.S.C. § 824a(a). The decision to join an RTO fundamentally transforms a utility's operations with respect to its federally regulated transmission facilities. Upon joining the RTO, the utility must cede operational control of its transmission facilities and transmission planning to a third party (the RTO). *See* 18 C.F.R. § 35.34(f), (k)(7). This carries risk. *See, e.g.*, Order No. 2000, 1999 WL 33505505, at *234. And to withdraw from the RTO, the utility generally must obtain FERC's approval that withdrawal is just and reasonable.

---

[2] Even before Order No. 2000, some parts of the country, including California, had developed ISOs to undertake regional coordination.

*See Atl. City Elec. Co. v. FERC*, 295 F.3d 1, 12 (D.C. Cir. 2002) (referencing "FERC's authority to review a specific withdrawal under [S]ection 205"); *Louisville Gas & Elec. Co. v. LG&E Energy LLC*, 114 FERC ¶ 61,282 at PP27-28 (2006) (discussing standard for FERC review of proposed withdrawal); *ISO New England, Inc.*, 109 FERC ¶ 61,147 at P41 (2004) (same); *see also CAISO Amended and Restated Transmission Control Agreement*, Section 3.3.3 ("Any withdrawal from this Agreement … shall be contingent upon the withdrawing party obtaining any necessary regulatory approvals for such withdrawal.").[3]

### B. Federal Incentives for Capital Investment to Improve Transmission Efficiency and Reliability.

#### 1. *Section 219*

In 2005, Congress amended the FPA and enacted Section 219, which offers a variety of incentives to induce utilities to invest in transmission facilities to improve the reliability and efficiency of the grid. *See* 16 U.S.C. § 824s.

Section 219(a) generally directed FERC to "establish, by rule, incentive-based (including performance-based) rate treatments for the transmission of electric energy in interstate commerce by public utilities *for the purpose of benefitting consumers by ensuring reliability and reducing the cost of delivered power by reducing transmission congestion*." *Id.* § 824s(a) (emphasis added). In Section 219(b),

---

[3] Available at: https://www.caiso.com/documents/transmissioncontrolagreement.pdf.

Congress further specified that FERC's rule should "promote reliable and economically efficient transmission and generation of electricity by promoting capital investment in the enlargement, improvement, maintenance, and operation of all facilities for the transmission of electric energy in interstate commerce"; "provide a return on equity that attracts new investment in transmission facilities"; and "encourage deployment of transmission technologies and other measures to increase the capacity and efficiency of existing transmission facilities and improve the operation of the facilities." *Id.* § 824s(b)(1)-(3).

Then, in Section 219(c)—the provision directly at issue in this case— Congress mandated that FERC "shall, to the extent within its jurisdiction, provide for incentives to each transmitting utility or electric utility that joins a Transmission Organization." *Id.* § 824s(c).[4] This provision reflected Congress' awareness that, as FERC explained in Order No. 2000, RTOs confer "significant benefits," including "improve[d] efficiencies in the management of the transmission grid" and "improve[d] grid reliability." Order No. 2000, 1999 WL 33505505, at *29; *see also id.* at *37 (describing the "universal" benefits of RTOs, among which are "increased efficiency," "improved congestion management," and "more efficient planning for

---

[4] "Transmission Organization" includes an RTO and ISO. *See id.* § 824o(a)(6); 18 C.F.R. § 35.35(b)(2). The phrase "to the extent within its jurisdiction" excludes a region of Texas that is not interconnected with the interstate grid and thus falls outside FERC's jurisdiction.

transmission and generation investments," all of which "will ultimately result in lower prices to the Nation's electricity consumers"). Congress therefore sought to induce greater transmission investment by RTO members; the RTOs' planning and coordination would help ensure that those investments were put to the most efficient uses to benefit consumers.

### 2.    Order No. 679

To implement Section 219, FERC issued Order No. 679, *Promoting Transmission Investment Through Pricing Reform*, 116 FERC ¶ 61,057 (2006), *order on reh'g*, Order No. 679-A, 117 FERC ¶ 61,345 (2006), *order on reh'g*, Order No. 679-B, 119 FERC ¶ 61,062 (2007). Order No. 679 set forth a range of incentives to encourage reliability and efficiency improvements to transmission infrastructure. *Id.* at PP84-193. These included multiple rate-based incentives to induce utilities to direct their capital towards transmission investment instead of other potential uses.[5]

---

[5] For example, Order No. 679 included rate-based incentives that permitted utilities to include 100% of prudently incurred transmission-related construction work in process in their rate base, which would "improve[] cash flow for applicants" and "eas[e] the pressures on their finances caused by transmission development programs," Order No. 679, 116 FERC ¶ 61,057 at P115; use hypothetical capital structures, which would help "foster transmission investment, *id.* at P131; seek accelerated depreciation in certain circumstances, which would "encourage investment in transmission infrastructure," *id.* at P135; recover 100% of prudently incurred costs of transmission facilities that are canceled or abandoned for reasons beyond the utility's control, thereby "reducing the risk of non-recovery of costs" for higher-risk projects, *id.* at P163; and defer recovery of new transmission investment costs in certain circumstances, which would provide "[i]ncreased certainty of cost

One way to induce increased investment in transmission facilities is to increase the authorized ROE for transmission investment—that is, increase the authorized return that investors will receive for their investment in transmission facilities. All else being equal, authorizing a higher ROE for transmission investment will give a utility a stronger incentive to invest an additional dollar in transmission facilities as compared to other potential uses for that capital, such as investment in generation or distribution facilities.[6]

Accordingly, to implement Section 219(c), FERC explained that it "will approve, when justified, requests for ROE-based incentives for public utilities that join and/or continue to be a member of an ISO, RTO, or other Commission-approved Transmission Organization." *Id.* at P326.[7] FERC stated that an entity "will be presumed to be eligible for the incentive if it can demonstrate that it has joined an

_____

recovery of new transmission investment" and thus "encourage development of more transmission infrastructure," *id.* at P175.

[6] A simple example may illustrate the point. Suppose a utility chooses to invest $100 in transmission infrastructure when the return it receives for such investments is 10.00%. The utility will then earn $10 on that investment. If FERC provides an adder increasing the authorized return to 10.50%, the utility will instead earn $10.50 on that investment. Thus, a higher ROE incentivizes a utility—which has many competing demands for its capital—to invest more in transmission investment rather than using that capital for other purposes.

[7] In practice, FERC has awarded a 50 basis-point adder for this purpose, provided that the resulting overall ROE remains reasonable. In other words, if a utility previously received a 10.00% ROE for its transmission investment, it would now receive a 10.50% ROE for its transmission investment, provided that 10.50% remained within the range of reasonableness. *See* 16 U.S.C. § 824s(d).

13

RTO, ISO, or other Commission-approved Transmission Organization, and that its membership is on-going." *Id.* at P327. FERC also stated that the "basis for the incentive" is a "recognition of the benefits that flow from membership in such organizations." *Id.* at P331.

FERC further explained that the adder would be available even to entities that had joined before the incentive was created. *Id.* (explaining that FERC's "interpretation of the statute [i.e., Section 219(c)] is that eligibility for this incentive flows to an entity *that* 'joins' a Transmission Organization and is not tied to when the entity joined" (emphasis added)). Though FERC noted in a single sentence that the incentive reflected the fact that "continuing membership is generally voluntary," *id.*, FERC did not adopt a proposal from commenters to make utilities categorically ineligible for the adder if they were ordered to join an RTO by state law, *id.* at P316. Instead, FERC explained that it would assess eligibility for the adder on a case-by-case basis. *Id.* at P326.

On rehearing, FERC reiterated that the aim of the incentive was to encourage utilities to invest in transmission infrastructure. FERC explained that the "stated purpose of section 219 is to provide incentive-based rate treatments that benefit consumers by ensuring reliability and reducing the cost of delivered power," and FERC again referenced the "consumer benefits, including reliability and cost benefits, provided by Transmission Organizations." Order No. 679-A, 117 FERC

14

¶ 61,345 at P86. FERC emphasized that the incentive should be awarded liberally, explaining that the "best way to ensure those benefits are spread to as many consumers as possible is to provide an incentive that is *widely available* to member utilities of Transmission Organizations and is effective for the entire duration of a utility's membership in the Transmission Organization." *Id.* (emphasis added).

In the years following Order No. 679, and in line with FERC's stated position that the adder should be "widely available," *id.*, FERC routinely granted the adder to utilities that requested it, noting the consumer benefits that result from RTO membership. *See, e.g.*, *Midcontinent Indep. Sys. Operator Inc.*, 150 FERC ¶ 61,004 at PP39-44 (2015); *PPL Elec. Utils. Corp.*, 123 FERC ¶ 61,068 at P35 (2008).

## II.    CALIFORNIA'S REGULATION OF RTO MEMBERSHIP

### A.    Petitioners' Voluntary RTO Participation.

In the 1990s, the CPUC sought to restructure California's electric industry. As relevant here, in 1995, the CPUC "ordered [Petitioners] … to submit to FERC a proposal to establish an [ISO] and to transfer operational control of their [transmission] facilities to that ISO." *CPUC v. FERC*, 879 F.3d 966, 971 (9th Cir. 2018) ("*CPUC I*"); *see also Order Instituting Rulemaking on Commission's Proposed Policies Governing Restructuring California's Electric Service Industry and Reforming Regulation*, D.95-12-063, 1995 WL 792086, at *99 (Cal. P.U.C. Dec. 20, 1995); Cal. Pub. Util. Code §§ 330, 365. The CPUC asserted that it was

empowered to issue this order, claiming that it "retained authority under California state law to review any transfer of control of transmission facilities to the ISO." *CPUC I*, 879 F.3d at 971 (citing CPUC D.95-12-063, 1995 WL 792086, at *15). In particular, the CPUC relied on California Public Utilities Code Section 851(a), which provides that a public utility "shall not sell, lease, assign, mortgage, or otherwise dispose of, or encumber the whole or any part of its … plant, system, or other property necessary or useful in the performance of its duties to the public, … or by any means whatsoever, directly or indirectly, merge or consolidate its … plant, system, or other property, … without first having [received] an order from the [CPUC] authorizing it to do so." Cal. Pub. Util. Code § 851(a).

Given the CPUC's assertion of authority under Section 851, Petitioners sought CPUC approval to join the newly created California Independent System Operator Corporation ("CAISO") in 1997.[8] In 1998, the CPUC issued an order approving the transfer of operational control of Petitioners' transmission assets to CAISO. *See Joint Application of Pac. Gas & Elec. Co.*, CPUC D.98-01-053, 1998 WL 242747 (Cal. P.U.C. Jan. 21, 1998) ("1998 Transfer Decision"). The 1998 Transfer Decision applies *only* to Petitioners and not to other utilities in California. The CPUC

---

[8] CAISO is an RTO that covers most of California and a part of Nevada and is interconnected with the electric grid covering the Western portion of the United States. Transmission facilities within CAISO are therefore facilities in interstate commerce regulated by FERC. *See, e.g.*, *FPC v. Fla. Power & Light Co.*, 404 U.S. 453, 462-63 (1972).

reiterated in that Decision that Section 851 governed Petitioners' request because Section 851 was "broad in scope" and that the "proposed transfer falls under the prohibition against 'otherwise disposing of' utility property that is used or useful without the [CPUC's] prior approval, even if it might not constitute a sale, lease, assignment, mortgage or encumbrance." *See id.* at *4. The CPUC further stated that "any future transfer of operational control of the transmission facilities *from* the ISO will, itself, be subject to review under PU Code Section 851." *Id*. at *7.

Thus, Petitioners have been members of CAISO since 1998. Following the enactment of FPA Section 219(c) and the issuance of Order No. 679, Petitioners routinely received the RTO adder. *See, e.g.*, *CPUC I*, 879 F.3d at 971-72 (noting that "[s]ince 2007, PG&E has regularly … request[ed] 50 basis-point incentive adders for its ongoing participation in [CAISO], and FERC has summarily granted those requests" (citing cases)); *CPUC v. FERC*, 29 F.4th 454, 459 (9th Cir. 2022) ("*CPUC II*") (noting that PG&E "regularly requested the incentive adders due to its ongoing membership in CAISO, and FERC summarily granted these requests to incentivize ongoing membership"). Similarly, Petitioners SCE and SDG&E began receiving the adder for CAISO membership in 2007. *See S. Cal. Edison Co.*, 121 FERC ¶ 61,168 at P58 (2007); *SDG&E*, 118 FERC ¶ 61,073 (2007); *SDG&E*, 143 FERC ¶ 61,246 (2013). Over the past fifteen years, Petitioners have relied on the adder in structuring their investment decisions.

17

**B.    This Court Confirms That PG&E Was Entitled to the RTO Adder.**

In response to PG&E's requests to receive a 50 basis-point adder in filings made in 2014 and 2015, the CPUC filed a protest contending that PG&E should not receive the adder because its membership in CAISO was not voluntary due to the 1998 Transfer Decision.  FERC rejected that argument and summarily granted the adder in both cases.  *See Pac. Gas & Elec. Co.*, 148 FERC ¶ 61,245 at P30 (2014); *Pac. Gas & Elec. Co.*, 152 FERC ¶ 61,252 at P23 (2015); *see generally CPUC I*, 879 F.3d at 971-72.

The CPUC then petitioned for review in this Court.  In *CPUC I*, decided in 2018, this Court held that FERC had not adequately considered under Order No. 679 whether PG&E's membership was voluntary.  *See CPUC I*, 879 F.3d at 978-79.  The Court reasoned that under Order No. 679, RTO membership gives transmission owners a presumption of eligibility for an adder, but that presumption could be rebutted by showing that membership was involuntary.  *Id.* at 974-75.  In particular, the Court held that FERC did not sufficiently grapple with Order No. 679's statement that the incentive is available in part due to the "fact that continuing membership is generally voluntary."  *Id.* at 974 (quoting Order No. 679, 117 FERC ¶ 61,345 at P331).

The Court did not address the text of Section 219(c), consider whether the FPA preempted states from mandating RTO membership, or decide whether PG&E

18

participated in CAISO voluntarily. Instead, as this Court subsequently explained, *CPUC I* only "addressed whether FERC could ignore the CPUC's assertion that membership in CAISO is not voluntary," and it "did not reach the merits of that issue." *CPUC II*, 29 F.4th at 462.

On remand from *CPUC I*, FERC again awarded PG&E the adder. FERC found that PG&E remained eligible for the adder because, under state law, PG&E was not mandated to participate in CAISO, so its participation in CAISO was in fact voluntary. *Pac. Gas & Elec. Co.*, 168 FERC ¶ 61,038, PP2, 42-52 (2019). In reaching that conclusion, FERC rejected the CPUC's contention in the 1998 Transfer Decision that Section 851 authorized the CPUC to review transfers of operational control, finding that California courts would not interpret Section 851 in that manner. *Id.* at PP46-52.

In *CPUC II*, this Court affirmed that determination and similar FERC determinations made in parallel proceedings concerning PG&E and SCE. It first concluded that "FERC does not have expertise in interpreting California state law" and "is not entitled to deference" to its interpretation. 29 F.4th at 464. Predicting how the California Supreme Court would interpret California law, this Court then held that, contrary to the 1998 Transfer Decision, Section 851 did not empower the CPUC to review transfers of operational control. It reasoned that a transfer of operational control was not a "disposition" of utility assets covered by Section 851.

*Id.* at 467.  The Court therefore concluded that "neither the text of California's Public Utilit[ies] Code nor any California caselaw mandates that utilities maintain ongoing membership in CAISO or get the CPUC's approval before leaving CAISO."  *Id.* at 468.  Thus, "FERC did not err in concluding that the Utilities' membership in CAISO is voluntary."  *Id.*

### C.    California's Revision of Section 362.

Six months after *CPUC II*, California enacted AB 209, which amended Cal. Pub. Util. Code Section 362.  The California legislature stated that the amendments "do not constitute a change in, but are declaratory of existing law, as established in [the 1998 Transfer Decision]."  AB 209 § 1(a)(2), Ch. 251 of the Statutes of 2022 (Cal. eff. Sept. 6, 2022).

The new Section 362(c) provides: "Consistent with Section 851 and the [CPUC's] regulation of transfers of operational control of electrical corporation facilities, an electrical corporation subject to [the 1998 Transfer Decision] shall participate in [CAISO]." Cal. Pub. Util. Code § 362(c).  In addition, Section 362(d) provides that an "electrical corporation shall not withdraw a facility from the operational control of the Independent System Operator without [CPUC] approval pursuant to Section 851."  *Id.* § 362(d).

The Legislature's revisions thus enshrined the CPUC's view of the 1998 Transfer Decision into state law.  In other words, state law now provides that,

20

contrary to this Court's holding in *CPUC II*, the CPUC *does* have authority under Section 851 to review the utilities' transfer of operational control of their facilities to CAISO and, as the 1998 Transfer Decision expressly contemplated, the authority to review a future application by the utilities to withdraw from CAISO and retake operational control of their facilities. *See* 1998 Transfer Decision, 1998 WL 242747, at *7 ("[A]ny future transfer of operational control of the transmission facilities *from* the ISO will, itself, be subject to review under PU Code Section 851…").

Accordingly, under Section 362(c), Petitioners, who are subject to the 1998 Transfer Decision, will continue to participate in CAISO unless and until they receive CPUC approval to withdraw pursuant to Section 851.

AB 209 also included legislative findings. Those findings assert that (1) the "transfer of control of an electric corporation's property is generally prohibited without approval by the [CPUC] pursuant to Section 851 of the Public Utilities Code," and (as noted above) (2) the amendments "do not constitute a change in, but are declaratory of, existing law" as established in the CPUC's 1998 Transfer Decision. AB 209 § 1(a)(1), (a)(2). Finally, the legislative findings assert that AB 209 "reaffirm[s] that an electric corporation currently participating in [CAISO] is not a voluntary participant." *id.* § 1(b)(1).

## III.   THE PRESENT DISPUTE

### A.   FERC's December 29, 2023 Order ("Initial Order")

On October 13, 2023, PG&E submitted its latest transmission owner rate filing to FERC.  Consistent with prior filings, PG&E's filing included a request for the 50 basis-point adder to its proposed ROE for continued participation in CAISO.  The CPUC, along with other parties, contested PG&E's eligibility for the adder.  They argued that the intervening change in California law—namely the revision to Section 362(c)—meant that PG&E was not a voluntary participant in CAISO and, based on this Court's interpretation of Order No. 679 in *CPUC I*, that only a voluntary participant was eligible to receive the RTO adder.  *See* ER-42-43 (Initial Order P21).  These parties requested that FERC grant summary disposition and reject PG&E's request.  ER-43-44 (*Id.* at P22).  In response, PG&E explained that FERC and this Court already had expressly held that PG&E was eligible for the adder due to its ongoing participation in CAISO and that its participation remained voluntary even after enactment of AB 209 because it was free to seek to withdraw from CAISO subject to CPUC approval.  ER-46 (*Id.* at P27).

On December 29, 2023, FERC issued its Initial Order summarily "reject[ing] PG&E's request for the RTO Adder."  ER-49 (*Id.* at P35).  In particular, FERC found that "by virtue of [Section 362(c)], PG&E is required to participate in CAISO and

cannot *unilaterally withdraw* from CAISO.   As such, PG&E's participation in CAISO is no longer voluntary."  ER-51 (*Id.* at P42) (emphasis added).

FERC acknowledged that California's law allows Petitioners to withdraw from CAISO if the CPUC approves.  ER-50, ER-51 (*Id.* at PP40, 43).  However, it concluded that PG&E's participation was not voluntary because only the ability to withdraw *unilaterally* qualified as "voluntary."  ER-50 (*Id.* at P40).  As FERC later summarized, as a result of California's new law, "(1) PG&E is required to participate in CAISO; (2) PG&E cannot unilaterally withdraw from CAISO; (3) PG&E's participation in CAISO is no longer voluntary; and (4) PG&E is no longer eligible for the RTO Adder."  ER-5 (Rehearing Order P7 (citing Initial Order P42)).

### B.   Petitioners' Rehearing Requests

Petitioner PG&E and (jointly) Petitioners SCE and SDG&E filed requests for rehearing of the Initial Order.

*First*, Petitioners argued that PG&E's participation remains voluntary even after enactment of Section 362(c).  Petitioners explained that Section 362(c) cross-references Section 851, which in turn permits utilities to seek to withdraw so long as they receive CPUC approval; and that the need to receive regulatory approval to withdraw does not make continued participation involuntary (just as, for example, the decision whether or not to merge is a voluntary choice, even though regulatory approval is needed for a merger).  ER-78-81.  FERC's suggestion in the Initial Order

that only "unilateral" withdrawal would be voluntary has no basis in Section 219(c) (which says nothing about voluntariness) or in Order No. 679 (which says only that continuing RTO membership is "generally voluntary"), or in this Court's case law. ER-79-84, 86-87; ER-116-120.

*Second*, Petitioners argued that in any event, FERC's exclusive jurisdiction over transmission facilities and transmission rates under the FPA preempts Section 362(c), again meaning that PG&E's participation in CAISO remains voluntary. ER-91-94; ER-121-127. Petitioners argued that Congress' jurisdiction over interstate transmission facilities and RTOs is exclusive, and Section 362(c) intrudes on that exclusive jurisdiction by purporting to dictate that utilities must hand over operational control of their federally regulated facilities to the RTO. ER-92; ER-122-123. In addition, Petitioners argued that Section 362(c) conflicts with the purposes and objectives of federal law, which make clear that transmission coordination and interconnection arrangements must be voluntary. ER-92-93; ER-124-127. Petitioners further argued that FERC must answer the preemption question—a purely legal issue that directly implicates the scope of FERC's own authority under the FPA—before it could rely on Section 362(c) to deny PG&E's adder. ER-93-94; ER-127-129.

*Third*, Petitioners argued that the plain text of Section 219(c) does not distinguish between voluntary and involuntary RTO membership. Rather, under

Section 219(c), FERC "shall" award the adder to "each" utility "that joins" an RTO, and Congress did not vest FERC with discretion to inquire into the utility's reason for joining. Petitioners further argued that to the extent Order No. 679 added a voluntariness requirement, that requirement has no effect because it is contrary to the statutory language of Section 219(c). *See* ER-70-74; ER-106-108. Petitioners argued that a voluntariness requirement is contrary to Section 219(c)'s policy of offering "incentive-based rate treatments that benefit consumers by ensuring reliability and reducing the cost of delivered power." ER-71-72 (quoting Order 679-A, 117 FERC ¶ 61,345 at P86)). Whether participation is voluntary has no bearing on whether consumers benefit from the utility's ongoing participation in the RTO. Thus, FERC's rejection of the adder is contrary to the text of Section 219(c).

## C.  The June 12, 2024 Order ("Rehearing Order")

Petitioners' rehearing requests were initially deemed denied by operation of law. Then, on June 12, 2024, FERC issued a substantive order on rehearing that "modif[ied] the discussion in the [Initial Order]" but "continue[d] to reach the same result." ER-3-4 (Rehearing Order P2). FERC summarized the two bases for its decision: (1) "Order No. 679 … requires a showing of voluntary membership in a Transmission Organization," and (2) "PG&E's membership in a Transmission Organization is not voluntary because the California statute requires PG&E to

participate in CAISO." ER-8 (*Id.* at P15). FERC then rejected each of Petitioners' arguments.

*First*, FERC again concluded that Section 362(c) makes PG&E's RTO participation involuntary, but it changed its reasoning. FERC abandoned its previous position that PG&E's CAISO participation was "involuntary" simply because PG&E could not "unilaterally withdraw." Instead, FERC interpreted Section 362(c) to *require* PG&E's participation in CAISO, with the CPUC lacking any authority to approve a request to withdraw. ER-19-20 (*Id.* at P37). In other words, according to FERC, PG&E cannot leave CAISO at all—even with CPUC approval. As FERC stated, "[w]e disagree … that entities subject to section 362(c), such as PG&E, may end their participation in CAISO subject to approval from CPUC." *Id.* It reached that conclusion (1) based on the words "shall participate," which implies an "ongoing relationship," and (2) by construing the cross-reference to Section 851 as "better read" merely "as a recognition that CPUC first claimed authority to authorize PG&E's participation in CAISO." *Id*. FERC also concluded that it was appropriate to rely on AB 209's preamble, concluding that "PG&E's contrary interpretation would run against the express language of section 1(b)(1)," which "reaffirm[ed]" that Petitioners were not voluntary participants in CAISO. ER-21 (*Id.* at P40.)

*Second*, FERC declined to address preemption, stating it "continue[d] to find that this proceeding is an inappropriate vehicle to address preemption concerns." ER-28-29 (*Id.* at P53) (quoting *Dayton Power & Light Co.*, 176 FERC ¶ 61,025 at P71 (2021)). FERC explained that "even if we agreed that the statute were preempted, only a federal court has the ultimate authority to invalidate [Section] 362(c) and (d)," and so it "exercise[d] [its] discretion not to further address the preemption issue." ER-29 (*Id.* at P54). FERC found that "[a]s the facts stand currently before us, section 362(c) is in place, rendering PG&E's RTO participation mandatory." *Id.*

*Third*, FERC "disagree[d] with Rehearing Parties that the [Initial Order] applied a voluntariness requirement in conflict with FPA section 219(c)." ER-11-12 (*Id.* at P21). FERC made essentially no textual argument in support of that conclusion, but instead explained that the requirement came from Order No. 679, "which was promulgated pursuant to and consistent with section 219(c)." *Id.* FERC further explained that its "focus in Order No. 679 on whether the RTO Adder induces some voluntary conduct is consistent with the court's observation in *CPUC I* that Order No. 679 was promulgated against the backdrop of [FERC's] 'longstanding policy that rate incentives must be prospective and that there must be a connection between the incentive and the conduct meant to be induced.'" ER-12-13 (*Id.* at P23) (quoting *CPUC I*, 879 F.3d at 977).

27

## STANDARD OF REVIEW

This Court reviews questions of law *de novo*. *Hodges v. Comcast Cable Commc'ns, LLC*, 21 F.4th 535, 541 (9th Cir. 2021). "Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority." *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2273 (2024). Moreover, because "FERC does not have expertise in interpreting California state law," FERC's "interpretation of California law is not entitled to deference." *CPUC II*, 29 F.4th at 464.

This Court "review[s] a decision by FERC to determine whether its action was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *CPUC I*, 879 F.3d at 973 (quoting 5 U.S.C. § 706(2)). The agency's decision is upheld "if the agency has 'examined the relevant considerations and articulated a satisfactory explanation for its action, including a rational connection between the facts found and the choice made.'" *Id.* (quoting *Elec. Power Supply Ass'n*, 577 U.S. at 292).

## SUMMARY OF ARGUMENT

The FERC orders under review are unlawful and must be vacated.

I.      Section 362(c) does not mandate RTO membership. In the Rehearing Order, FERC erroneously held that utilities *cannot* withdraw from CAISO *even with* CPUC approval. That interpretation is inconsistent with Section 362(c)'s plain

language. As FERC acknowledged in its Initial Order, AB 209 allows California investor-owned utilities to withdraw from CAISO upon approval by the CPUC—a position the CPUC itself seemingly continues to maintain. *See* ER-50 (Initial Order P40). And the need to obtain regulatory approval before taking an action does not mean that a utility acts involuntarily when deciding whether or not to take the action. FERC itself has required utilities to seek its approval before they withdraw from an RTO—yet does not take the position that this requirement makes utilities' participation in RTOs involuntary.

II.     To the extent that Section 362(c) does require RTO membership, the statute is preempted by the FPA and cannot provide a permissible basis for FERC's denial of the adder. When a utility joins an RTO, it must turn over operational control of its transmission facilities to the RTO. Interstate transmission facilities are within FERC's exclusive jurisdiction, and Congress has further specified that participation in RTOs must be "voluntary." 16 U.S.C. §§ 824(b)(1), 824a(a). A state has no authority to require a utility to turn over operational control of its federally regulated transmission facilities to a federally regulated, independent third party. Section 362(c) is preempted because it intrudes on exclusive federal jurisdiction over the field of interstate transmission facilities and aims directly at FERC's federal rate determination. And Section 362(c) conflicts with Congress' express policy choice to make the coordination of utilities' facilities voluntary.

29

This preemption question goes to the heart of FERC's own authority. Congress cannot have intended for FERC to deny the adder on the basis of a state law that Congress intended to preempt. FERC's refusal to address this issue ignored an important part of the problem and was arbitrary and capricious. In considering preemption, FERC does not need to invalidate any state laws. Instead, it must only find that it cannot base *its own* rate determination on a state law that intrudes on its exclusive jurisdiction.

III. Finally, the plain text of Section 219(c) is clear that eligibility for the adder does not depend on whether a utility's membership in an RTO is voluntary or compelled by state law. The adder is awarded to "each" utility "that joins" an RTO. 16 U.S.C. § 824s(c). Whether the utility joined voluntarily or was required to do so is irrelevant. The "incentive" referenced in Section 219(c) is the 50 basis-point adder that RTO members receive, and the behavior the incentive is intended to induce is increased "capital investment in the enlargement, improvement, maintenance, and operation of all facilities for the transmission of electric energy in interstate commerce." *Id.* § 824s(b)(1). The adder induces that behavior because it "provide[s] a return on equity that attracts new investment in transmission facilities," *id.* § 824s(b)(2): providing utilities with a higher return on transmission investment will induce them to deploy their capital to make transmission investments rather than use that capital in other ways. Congress sought to induce additional investment by

RTO members in particular because RTOs coordinate transmission and operations across a wide area, so are particularly good at increasing system efficiency. FERC's interpretation of the statute frustrates Congress' goal because it allows states like California to pass laws that (in FERC's view) require it to eliminate the adder, thereby taking away the incentive Congress intended for additional "capital investment" in transmission facilities within RTOs. *Id.*

Finally, even if there were an implicit voluntariness requirement in Section 219(c), the text is unambiguous that this requirement could possibly apply only to utilities' initial decision to *join*. There is no dispute that PG&E joined voluntarily in 1998—more than two decades before California revised Section 362(c) purportedly to compel RTO membership.

## ARGUMENT

## I. CALIFORNIA LAW PERMITS UTILITIES TO WITHDRAW FROM CAISO.

PG&E is entitled to the adder because California law does not require RTO membership. Instead, it requires only that California investor-owned utilities obtain regulatory approval before withdrawing from CAISO. The utilities' decision to continue their participation in CAISO—and not to seek to withdraw—is voluntary, and the adder provides an incentive for the utilities to make that choice. FERC erred in holding otherwise.

31

### A.    AB 209 Allows Withdrawal From CAISO with CPUC Approval.

FERC's Rehearing Order asserts that PG&E's participation in CAISO is mandatory because, under Section 362(c), the utilities are forbidden to withdraw from CAISO and the CPUC has no authority to approve such a withdrawal.  As FERC stated, Section 362(c) "does not permit PG&E to end its participation in CAISO with approval of the CPUC."  ER-19-20 (Rehearing Order P37); *id.* ("We disagree … that entities subject to section 362(c), such as PG&E, may end their participation in CAISO subject to approval from CPUC.").

That interpretation is contrary to the California statute's plain text and purpose, and the Court should reject it.  As described above, AB 209 was intended to be "declaratory of[] existing law[, as] established in [the 1998 Transfer Decision]."  AB 209 § 1(a)(2).  And the 1998 Transfer Decision expressly stated that the CPUC *may* approve a withdrawal from CAISO under the standard set forth in Section 851: "[A]ny future transfer of operational control of the transmission facilities *from* the ISO will, itself, be subject to review under PU Code Section 851…."  1998 Transfer Decision, 1998 WL 242747, at *7.

Thus, Section 362(c) states: "*Consistent with Section 851 and the commission's regulation of transfers of operational control of electrical corporation facilities*, an electrical corporation subject to [the 1998 Transfer Decision] shall

32

participate in the Independent System Operator."  Cal. Pub. Util. Code § 362(c) (emphasis added).

FERC emphasizes the latter portion of that provision, stating that the California utilities subject to the 1998 Transfer Decision "shall participate" in CAISO.  ER-19-20 (Rehearing Order P37).  But Section 362(c) does not mandate that they "shall participate" in CAISO, full stop.  Rather, the "shall participate" language is qualified by the introductory phrase: "Consistent with Section 851 and the [CPUC's] regulation of transfer of operational control of electrical corporation facilities."  Cal. Pub. Util. Code § 362(c).  Thus, the utilities "subject to" the 1998 Transfer Decision "shall participate" in CAISO as that Decision contemplates.  But "[c]onsistent with Section 851" and the 1998 Transfer Decision, those utilities may also seek approval to withdraw from CAISO, and the CPUC may grant such approval.  If granted, then the utilities could leave CAISO, "consistent with" that Decision.

FERC's interpretation, meanwhile, makes Section 362(c) nonsensical.  If that provision really required CAISO membership and denied the CPUC the authority it claimed in the 1998 Transfer Decision to consider "any future transfer of operational control of the transmission facilities *from* the ISO," 1998 Transfer Decision, 1998 WL 242747, at *7, then the Legislature would not have claimed to be legislating *"[c]onsistent with* Section 851 and the [CPUC's] regulation of transfers of

33

operational control." Cal. Pub. Util. Code § 362(c) (emphasis added). Indeed, under FERC's interpretation, the statute's "shall participate" language would be *inconsistent* "with Section 851 and the [CPUC's] regulation of transfer of operational control of electrical corporation facilities." *Id.* The Court should reject an interpretation of the statute, like FERC's, that creates a self-contradiction[9] or, to avoid self-contradiction, renders a portion of the statute inoperative.[10]

FERC asserts that Section 362(c)'s "reference to section 851 and CPUC's regulation of transfers of operational control of electric facilities … is better read as a recognition that CPUC first claimed authority to authorize PG&E's participation in CAISO under section 851." ER-19-20 (Rehearing Order P37). But FERC cannot cherry-pick the parts of the 1998 Transfer Decision it likes and ignore the parts it doesn't. The CPUC claimed authority *both* to authorize PG&E's participation *and* to authorize any future withdrawal. 1998 Transfer Decision, 1998 WL 242747, at *7. FERC improperly disregards the latter.

FERC also places heavy reliance on AB 209's preamble, which asserts an intent to "reaffirm that an electrical corporation currently participating in the

---

[9] *E.g.*, *People v. Moroney*, 24 Cal. 2d 638, 642 (1944) ("All the parts of a statute must be construed together, and harmonized … and so read, if possible, as to avoid repugnancy" (quotation marks omitted)).

[10] *E.g.*, *Copley Press, Inc. v. Superior Ct.*, 39 Cal. 4th 1272, 1285 (2006) ("Well-established canons of statutory construction preclude a construction [that] renders a part of a statute meaningless or inoperative." (quotation marks omitted)).

[Independent System Operator] is not a voluntary participant." ER-19, 21 (Rehearing Order PP36, 40 (quoting AB 209 § 1(b)(1))). Of course, what matters is the operative language of the statute, not the preamble.[11] But in any event, when read as a whole, the preamble is fully consistent with a utility's ability to seek permission to withdraw from CAISO. First, AB 209 Section 1(a)(1) provides that under Section 851 the transfer of operational control is prohibited "without prior approval" of the CPUC—thus reaffirming that the CPUC has authority to decide whether or not to approve a transfer, as contemplated in the 1998 Transfer Decision. Second, AB 209 Section 1(a)(2) states that the amendments to Section 362 "do not constitute a change in, but are declaratory of, existing law, as established in [the 1998 Transfer Decision]"—a decision that, again, asserted CPUC authority to review an application to withdraw from CAISO. Third, AB 209 Section 1(b)(2) asserts that "a final order or decision of the Public Utilities Commission, such as [the 1998 Transfer Decision], is conclusive in all collateral actions or proceedings"— thus repudiating this Court's review of that decision in *CPUC II*. FERC ignores these other parts of the preamble. AB 209 § 1(b)(2).

---

[11] *E.g.*, *Yeager v. Blue Cross of Cal.*, 175 Cal. App. 4th 1098, 1103 (2009) (finding that a statute's preamble "is not binding in the interpretation of the statute" and "may not overturn the statute's language"); *Chambers v. Miller*, 140 Cal. App. 4th 821, 825-26 (2006) (similar).

So, read as a whole, the preamble reinforces what the text of Section 362(c) makes clear:  the Legislature has rejected the interpretation of state law in *CPUC II*, a decision issued mere months before AB 209 was passed, and revised state law to embrace the 1998 Transfer Decision's holding that under Section 851, the CPUC has authority to review the transfer of operational control of a utility's assets—both the utility's conveyance of operational control *to* CAISO and the utility's withdrawal of operational control *from* CAISO.  Although the utilities cannot withdraw from CAISO without CPUC approval, nothing prohibits them from filing an application with the CPUC to withdraw.

Section 362(d) also reinforces that a California investor-owned utility may apply to withdraw from CAISO under Section 362(c).  Section 362(d) provides: "An electrical corporation shall not withdraw a facility from the operational control of the Independent System Operator without commission approval pursuant to Section 851."  Cal. Pub. Util. Code § 362(c).  Section 362(c) requires the CPUC's approval of a California investor-owned utility seeking to take back operational control of its facilities in whole, and Section 362(d) clarifies that the CPUC's approval is needed even if a California investor-owned utility seeks to take back operational control of even a single facility.  Section 362(d) thus prevents a utility from defeating the CPUC's regulatory authority under Section 851 by withdrawing facilities from CAISO's operational control in piecemeal fashion.

36

FERC's interpretation in the Rehearing Order, by contrast, results in absurdity. Under its view, the CPUC has authority to approve a California investor-owned utility's application to withdraw all but one of its facilities from CAISO's operational control, but it has no authority to approve withdrawal of the final piece of equipment, as that would result in a full withdrawal from CAISO. The Court should reject such a reading. *See Nat'l Shooting Sports Found., Inc. v. California*, 5 Cal. 5th 428, 433 (2018) ("[T]he absurdity canon … counsels courts to 'avoid any [statutory] construction that would produce absurd consequences.'" (citations omitted)); *Grassi v. Superior Ct.*, 73 Cal. App. 5th 283, 291 (2021) ("[S]tatutes or statutory sections relating to the same subject must be harmonized, both internally and with each other, to the extent possible." (quotation marks omitted)).

Finally, even the CPUC does not contend that it lacks authority to approve the withdrawal of PG&E or SCE and SDG&E from CAISO. Instead, in a complaint against SDG&E, the CPUC sought to eliminate SDG&E's RTO adder "based on the California law requirement that SDG&E participate in CAISO *and* not leave [CAISO] *without CPUC authorization*."[12]

---

[12] Complaint and Petition for Declaratory Order at 21, *Cal. Pub. Utils. Comm'n v. San Diego Gas & Electric*, Docket No. EL24-115 (F.E.R.C. May 31, 2024), https://elibrary.ferc.gov/eLibrary/filelist?accession_number=20240531-5455 (emphasis added).

Accordingly, the Court should reject FERC's position in the Rehearing Order that Section 362(c) does not allow the CPUC to entertain and approve an application to withdraw from CAISO.[13]  Section 362(c)'s text and purpose show that California ratified the CPUC's longstanding position, set forth in the 1998 Transfer Decision, that the CPUC is authorized under Section 851 to review Petitioners' choice to join or leave CAISO.

### B.    The Need to Seek Regulatory Approval Does Not Make an Action Involuntary.

In the Initial Order, FERC acknowledged that AB 209 allowed utilities to seek withdrawal, stating that PG&E "may not withdraw from CAISO without CPUC approval."  ER-21 (Initial Order P39); ER-22-23 (*id.* at P42) (under AB 209, PG&E "cannot unilaterally withdraw from CAISO"); ER-23 (*id.* at P43) (AB 209 "does not permit PG&E to withdraw from CAISO without CPUC approval").  As discussed above, that interpretation of Section 362 was correct.

However, FERC then held that, because CPUC approval was needed for withdrawal, RTO membership was "require[d]" and the utilities did not remain in CAISO voluntarily.  ER-21 (*Id.* at P39); *see also* ER-22-23 (*id.* at P42); ER-23 (*id.*

---

[13] The text of Section 362 is clear in affirming that the CPUC may consider and approve an application to withdraw from CAISO.  But if the Court nonetheless finds the statute ambiguous, constitutional avoidance further supports adopting Petitioners' reading to avoid an interpretation of state law that is preempted by federal law.  *See infra* Part II; *see also, e.g.*, *People v. Gutierrez*, 58 Cal. 4th 1354, 1373 (2014) (courts will construe statute to "render it … free from doubt as to its constitutionality").

at P43).  The Court should reject that position.  RTO membership is not involuntary just because regulatory approval is needed for withdrawal.[14]  After all, virtually everything a regulated utility does is subject to regulatory approval, but the utility still makes voluntary choices whether to seek approval or not.

For example, when a California utility wishes to "construct an extension, expansion, upgrade, or other modification to its existing electrical transmission facilities," it must seek CPUC approval.  Cal. Pub. Util. Code § 564.  When a California utility wishes to "construct, own, and operate an eligible renewable energy resource," it must obtain CPUC approval.  *Id.* § 399.14(a)(1).  When a California utility wishes to implement a plan to underground its electric distribution facilities to reduce wildfire risk, it must seek CPUC approval.  *Id.* § 8388.5.  When a California utility wants to invest in electric vehicle infrastructure, it must seek CPUC approval.  *Id.* § 740.18.  So too when it wants to acquire stock of another utility or sell utility property. *Id.* §§ 851(a), 852.  A utility must also seek CPUC approval for its plan to procure the electricity needed to serve its customers.  *Id.* § 454.5.  And, of course, a utility must seek CPUC approval when it wishes to change the rates it charges its customers.  *Id.* § 454.

---

[14] Notably, in *CPUC I*, FERC *agreed* that the need to obtain regulatory approval did not make membership involuntary.  *See* Br. of FERC at 24, *CPUC I*, No. 16-70481 (9th Cir. Sept. 19, 2016), 2016 WL 5391636 ("Pacific Gas's continued participation in the California System Operator cannot be labeled 'involuntary[]' … simply because it must … seek approval to leave.").

These are just some examples—but in every one, the utility makes a voluntary choice about whether or not to take the action for which approval is needed. It would be nonsensical, for example, to argue that because regulatory approval is needed before a rate change can take effect, a utility is prohibited from changing its rates; or that because regulatory approval is needed before a facility upgrade can be constructed, a utility is required to make do with existing facilities. A utility makes the voluntary choice whether or not to seek regulatory approval for these actions. *See, e.g.*, *CPUC v. FERC*, 20 F.4th 795, 797 (D.C. Cir. 2021) (describing the "bilateral agreements between utilities and generating resources," which are subject to CPUC review, as "voluntary"); *MCI Worldcom Network Servs., Inc. v. FCC*, 274 F.3d 542, 545 (D.C. Cir. 2001) (discussing "voluntary conditions" on merger imposed by FCC).

So too when it comes to RTO/ISO membership. The requirement to obtain regulatory approval before withdrawing from an RTO/ISO is not the same as a prohibition on withdrawal or a mandate to remain. Indeed, FERC itself has required utilities to obtain FERC approval before they can withdraw from an RTO, but FERC views that approval requirement as entirely consistent with the federal-law requirement that RTO membership must be "voluntary." *See ISO New England, Inc.*, 109 FERC ¶ 61,147 at P41 (undertaking a "review of a requested withdrawal from the [New England] RTO" but—in the same paragraph—reiterating that

"participation in an RTO is voluntary"). That is why the D.C. Circuit held that FERC could review a utility's decision to exit an RTO, notwithstanding the federal law requirement that RTO membership is voluntary. *See Atl. City Elec. Co.*, 295 F.3d at 12 (stating that FERC could not lawfully "prohibit the utility petitioners from ending their voluntary coordination and interconnection through the PJM ISO," but that "does not mean that FERC is prohibited from reviewing entry to or exit from an ISO"). There is no reason why that should be the case for a federal regulatory approval, but not equally true for a state regulatory approval.[15]

What is more, when reviewing an application to withdraw, the CPUC cannot arbitrarily deny approval. Under Section 851, the CPUC analyzes only whether the withdrawal is "not adverse to the public interest." *Application of San Diego Gas & Electric Company (U902E)*, D.11-05-048 at 7, 2011 WL 2246056 (Cal. P.U.C. May 26, 2011) (CPUC encourages but does not require affirmative public interest (citing CPUC D.09-07-035 and CPUC D.09-04-013)); *see also Joint Application of California-American Water Company (U210W) and Warring Water Service, Inc. (U331W)*, D.22-08-005, 2022 WL 3910231, at *7 (Cal. P.U.C. Aug. 4, 2022) (noting that in conducting its public interest review, the CPUC "has more routinely applied

---

[15] Indeed, the CAISO Tariff does not distinguish between federal and state approvals with respect to withdrawal. *See CAISO Amended and Restated Transmission Control Agreement*, Section 3.3.3 ("Any withdrawal from this Agreement … shall be contingent upon the withdrawing party obtaining any necessary regulatory approvals for such withdrawal.").

the 'ratepayer indifference standard' which requires a finding that is no harm or adverse impact to the ratepayers" rather than requiring a net benefit).  And if approval is denied, the aggrieved utility can seek judicial review.  If the utility prevails, the utility can effectuate its withdrawal notwithstanding the CPUC's refusal to grant approval.

So, under Order No. 679's framework—according to which the purpose of Section 219(c)'s incentive is to "induc[e] utilities to voluntarily remain in transmission organizations," *CPUC I*, 879 F.3d at 977; *see id.* at 978 (Order No. 679 recognizes that "utilities may need incentives to choose to remain in such organizations")—the incentive is warranted notwithstanding a requirement to seek regulatory approval to effectuate a withdrawal.  The RTO adder induces California utilities to remain voluntarily in CAISO, rather than seeking to withdraw under a "public interest" standard that affords the utilities wide discretion—and, if permission were nevertheless denied, seeking judicial review of that denial. Thus, the California utilities are entitled to the RTO adder under Order No. 679.[16]

---

[16] In its Rehearing Order, FERC mentions in passing this Court's reference to "unilateral withdrawal" in *CPUC I*.  *See* ER-23-24 (Rehearing Order P44).  But this Court did not hold or even suggest that the ability to "unilaterally withdraw" was a prerequisite for a determination of voluntariness.  *CPUC I*, 879 F.3d at 979.  Indeed, it specifically noted FERC's argument that participation is still voluntary even if regulatory approval to withdraw from the RTO/ISO is required and declined to address the issue because it was unnecessary to decide the case.  *Id.* at 978 n.5.

## II.   FERC'S ORDERS MUST BE VACATED BECAUSE CONGRESS PREEMPTED STATE LAWS MANDATING RTO MEMBERSHIP.

Even if Section 362(c) did mandate RTO membership, it still could not form the basis of FERC's denial of PG&E's adder because Congress has preempted such state laws. Section 362(c) intrudes on a field Congress has reserved exclusively for FERC, and it conflicts with federal law by making mandatory what Congress determined should be voluntary. Section 219(c)'s application therefore cannot depend on such state law. FERC's refusal to address this preemption question—which goes to the heart of FERC's own authority under Section 219(c)—ignored an important aspect of the problem and was arbitrary and capricious. Congress cannot have intended for FERC to deny an adder based on a state law that Congress preempted.

### A.   Section 362(c) Is Field Preempted.

First, to the extent that Section 362(c) mandates RTO participation, it is field preempted. When Congress exclusively occupies a given field, state laws that "aim[] directly at" or regulate within that field are invalid. *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 385 (2015) (quotation marks omitted); *see also Kurns v. R.R. Friction Prods. Corp.*, 565 U.S. 625, 630 (2012); *Assurance Wireless USA, L.P. v. Reynolds*, 100 F.4th 1024, 1032 (9th Cir. 2024). Field preemption does not require a direct conflict between federal and state law but rather is the consequence of federal law

showing Congress' intent "to foreclose any state regulation in the area." *Arizona v. United States*, 567 U.S. 387, 401 (2012).

Congress has occupied the field of interstate electric transmission facilities. The FPA grants FERC exclusive jurisdiction over the "transmission of electric energy in interstate commerce" and "all facilities for such transmission or sale of electric energy [at wholesale]." 16 U.S.C. § 824(b)(1); *see Transmission Agency*, 295 F.3d at 928 ("FERC's exclusive jurisdiction extends over all facilities for such transmission or sale of electric energy." (quotation marks omitted)); *Duke Energy Trading & Mktg., L.L.C. v. Davis*, 267 F.3d 1042, 1056 (9th Cir. 2001) (same). By contrast, the FPA reserves state authority only over "facilities used for the generation of electric energy" and "facilities used in local distribution or only for the transmission of electric energy in *intra*state commerce." 16 U.S.C. § 824(b)(1) (emphasis added).

The Supreme Court has made clear that this provision has broad preemptive effect. In *Hughes*, for instance, the Court concluded that this provision's conferral of exclusive federal jurisdiction over wholesale sales preempted state laws attempting to regulate wholesale sales. *Hughes*, 578 U.S. at 163. And FERC's authority over transmission is even "broader." *See S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41, 63 (D.C. Cir. 2014). Although states retain authority over the siting of transmission facilities, once those facilities are built and the electricity they transmit

flows in interstate commerce, their control is subject to FERC's exclusive authority. *New York v. FERC*, 535 U.S. 1, 7, 16 (2002); *Duke*, 267 F.3d at 1057 ("[I]t is common ground that if FERC has jurisdiction over a subject, the States cannot have jurisdiction over the same subject." (quoting *Miss. Power & Light Co. v. Miss. ex rel. Moore*, 487 U.S. 354, 377 (1988) (Scalia, J., concurring)).

Under this precedent, Section 362(c) is field preempted. "States may not seek to achieve ends, however legitimate, through regulatory means that intrude on FERC's authority." *Hughes*, 578 U.S. at 164. According to FERC, Section 362(c) purports to require Petitioners to turn over operational control of their transmission facilities to an independent third party, CAISO, by stating that Petitioners "shall participate" in CAISO. Cal. Pub. Util. Code § 362(c). But issues relating to the operational control of federally regulated transmission facilities are subject to FERC's exclusive oversight and jurisdiction. *See* 16 U.S.C. § 824(b); *id.* § 824a(a). FERC's "exclusive jurisdiction extends over all facilities for such transmission … [and] over … any person who owns or operates facilities subject to FERC's jurisdiction." *Duke*, 267 F.3d at 1056.

Section 362(c) intrudes on the federal field even more directly than the Maryland program invalidated in *Hughes*. In *Hughes*, Maryland tried to indirectly modify FERC's rate for wholesale sales by guaranteeing a Maryland generator an extra payment for wholesale sales that it made. 578 U.S. at 163. The Supreme Court

45

held that Maryland's requirement's "invade[d] FERC's regulatory turf" by indirectly "adjusting an interstate wholesale rate" subject to FERC's jurisdiction. *Id.* Here, California has directly invaded FERC's domain by mandating who must have operational control over federally regulated transmission facilities, and directing that such control reside in a federally regulated RTO/ISO.

Moreover, in assessing field preemption, the Supreme Court has "emphasize[d] the importance of considering the *target* at which the state law *aims* in determining whether that law is pre-empted." *Oneok*, 575 U.S. at 385. Here, Congress has directed FERC to review and approve the rates transmission owners charge for transmitting energy to ensure they are "just and reasonable." 16 U.S.C. § 824d(a). Yet the circumstances and timing of California's enactment of AB 209— passed in the immediate aftermath of *CPUC II*, following the CPUC's unsuccessful, multi-year effort to strip Petitioners of the adder and applied only to Petitioners and not other California transmission owners—makes clear that California has directly targeted the federal rate incentive for Petitioners.

By purporting to regulate who has operational control over interstate transmission facilities and which utilities are entitled to federal rate incentives, Section 362(c) intrudes on FERC's exclusive jurisdiction.

46

**B.    Section 362 Is Conflict Preempted.**

Section 362 also is conflict preempted because it directly conflicts with Congress' instruction that regulators must leave the choice to join or leave an RTO to the utility.  A statute is conflict preempted if it is impossible to comply with both state and federal law, or if the state law poses an obstacle to the "full purposes and objectives" of the federal law.  *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372-73 (2000); *see also Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 108 (1992).  "[W]hat constitutes a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and effects."  *Chamber of Com. of the U.S. v. Bonta*, 62 F.4th 473, 482 (9th Cir. 2023) (quotation marks omitted).

Here, FPA Section 202(a) commands that utilities must be free to choose whether or not to join and remain in an RTO.  16 U.S.C. § 824a(a).  Section 202(a) directs FERC to "divide the country into regional districts for the *voluntary* interconnection and coordination of facilities for the … transmission[] … of electric energy."  16 U.S.C. § 824a(a) (emphasis added).  "[C]oordination" refers to the "coordinated *operation* of existing transmission facilities," *South Carolina*, 762 F.3d at 59—*i.e.*, the operational control over those facilities.  Congress also specified that it "shall be the duty of [FERC] to promote and encourage … interconnection and coordination" within and among regional districts.  16 U.S.C. § 824a(a).  And

47

Congress correspondingly made clear that states would play only a consultative role in this process, requiring FERC only to "give notice to the State commission of each State situated wholly or in part within such district" and "afford each such State commission reasonable opportunity to present its views and recommendations." *Id.*

Thus, this provision of the FPA "has been definitively interpreted to make clear that Congress intended coordination and interconnection arrangements [to] be left to the 'voluntary' action of the utilities." *Atl. City Elec. Co.*, 295 F.3d at 12. Under federal law, "[m]embership in an RTO is voluntary," and "members who think they're being mistreated … can vote with their feet." *Ill. Com. Comm'n*, 721 F.3d at 776.

Consistent with this provision of the FPA, FERC issued Order No. 2000 and embraced a "voluntary approach" to RTO membership. *See* Order No. 2000, 1999 WL 33505505, at *3. And, as noted, FERC rejected comments that FERC should require mandatory RTO membership because "an open collaborative process that relies on voluntary regional participation" will produce RTOs that are better "tailored to specific needs of each region." *Id.* at *4. FERC also found voluntary interconnection better suited to meet the challenges transmission owners and regulators faced in "the rapidly evolving state of the electric industry." *Id.* at *49.

If Section 362(c) actually required CAISO membership, California's mandate would create both an impossibility and an obstacle to the federal policy of voluntary

participation. It is impossible to join an RTO voluntarily and be compelled to do so at the same time. And Section 362(c) would frustrate the federal model of voluntary membership in transmission organizations and create an insuperable obstacle to the achievement of that policy.[17]

### C. The Commission Arbitrarily Declined to Answer the Preemption Question.

FERC declined to address the preemption question, and its refusal to do so was arbitrary and capricious. An agency action is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider," or where the agency "entirely fail[s] to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42-43 (1983). Here, the ultimate issue is whether FERC is authorized to deny the adder to a utility based on a state law purporting to regulate who has operational control over federally regulated transmission facilities. But Congress cannot have intended for FERC to rely on a state law in applying Section 219(c) when other provisions of the FPA preempt that very state law.

By refusing to address this issue, FERC has acted arbitrarily and capriciously. FERC has routinely addressed preemption in other proceedings and should have done the same here. *See, e.g.*, *New England Ratepayers Ass'n*, 168 FERC ¶ 61,169

---

[17] Again, at a minimum, Section 362(c) should be construed to avoid this unconstitutional outcome.

at P41 (2019) (determining New Hampshire law is preempted); *CPUC*, 132 FERC ¶ 61,047 at P67 (2010) (California law not preempted); *Midwest Power Sys. Inc.*, 78 FERC ¶ 61,067 at 61,246 (1997) (Iowa law preempted in part).  FERC's "complete failure to address that key question is fatal to its conclusion." *Wilderness Watch, Inc. v. U.S. Fish & Wildlife Serv.*, 629 F.3d 1024, 1039 (9th Cir. 2010).

All FERC offers in response is that "only a federal court has the ultimate authority to invalidate" California's law.  ER-29 (Rehearing Order P54).  But no one is asking FERC to invalidate or enjoin California's law.  Rather, Petitioners asked FERC to assess the effect of a preempted state law on FERC's own rate determination.  And rate determinations are squarely within FERC's own purview. *See* 16 U.S.C. §§ 824d, 824e.  It is not rational for FERC to make its own rates contingent on whether a state enacts a law mandating RTO membership without assessing whether the state has authority to enact such a law.

In any case, even FERC accepts that this Court may consider the preemption question.  ER-29 (Rehearing Order P54).  And FERC further agrees that the "issue of PG&E's eligibility for the RTO Adder is a legal, rather than a factual, issue."  ER-30-31 (*Id.* at P58).  Thus, this Court can decide whether Section 362(c) is preempted

and vacate FERC's order for arbitrarily relying on that preempted source of authority.[18]

### III. FERC'S DENIAL OF THE ADDER IS CONTRARY TO THE UNAMBIGUOUS TEXT OF SECTION 219(c).

Finally, the plain text of Section 219(c) awards the adder to all utilities regardless of whether their participation is compelled by state law. FERC's attempt to distinguish between voluntary and involuntary participation is contrary to law and cannot be upheld.

### A. A Voluntariness Requirement Conflicts with the Plain Text of Section 219(c).

FERC's Orders are contrary to law because they are premised on the incorrect assumption that a utility must be a voluntary member of an RTO to receive the incentive. But that condition appears nowhere in the plain text of Section 219(c). That provision states that FERC "*shall … provide for incentives to each* transmitting utility or electric utility *that joins* a Transmission Organization." 16 U.S.C. § 824s(c) (emphases added). The plain text repeatedly makes clear that FERC lacks discretion to limit the adder only to voluntary members of an RTO.

---

[18] At the very least, this Court should remand to FERC to address whether Section 362 is preempted and thus whether its rate determination can depend upon that law—though the Court would owe FERC no deference on that pure legal question. *See Loper Bright*, 144 S. Ct. at 2273.

First, Section 219(c) specifies that FERC "shall" provide the adder to the utilities covered by the provision. "Shall" is mandatory language that limits the agency's discretion. *See, e.g.*, *Me. Cmty. Health Options v. United States*, 590 U.S. 296, 310 (2020) ("The first sign that the statute imposed an obligation is its mandatory language: 'shall.' 'Unlike the word "may," which implies discretion, the word "shall" usually connotes a requirement.'" (citation omitted)); *Newman v. Chater*, 87 F.3d 358, 361 (9th Cir. 1996) ("'Use of the word "shall" generally indicates a mandatory intent unless a convincing argument to the contrary is made'" (citation omitted)).

Second, Section 219(c) specifies that the incentive shall be provided "to each" utility within the provision's scope. The words "to each" again eliminates any discretion to provide the adder to some but not to others. *See, e.g.*, Each, *Collins English Dictionary*, https://collinsdictionary.com/us/dictionary/english/each (last visited Sept. 4, 2024) ("If you refer to each one of the members of a group, you are emphasizing that something applies to every one of them."). Thus, Congress again made clear that the incentive must be provided to *every* utility "that joins a Transmission Organization," and it did not accord FERC discretion to distinguish among utilities that satisfy that requirement.

Third, Section 219(c) provides that the incentive is available to each utility "that joins" an RTO. The use of the word "joins" is inconsistent with an inquiry into

why the utility is a member of the RTO. "Join" simply means to "come into contact or union with," regardless of the reason. Join, *Collins English Dictionary*, https://www.collinsdictionary.com/us/dictionary/english/join (last visited Sept. 4, 2024). This reading accords with ordinary English: when a child joins the Girl Scouts, one does not ask whether the parents required the child to join or whether the child joined voluntarily. "Join" just describes the fact of membership. So too when a transmission owner joins an RTO.

Indeed, the only way to derive a voluntariness requirement is to add words to the statute. But courts "do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply." *Jama v. ICE*, 543 U.S. 335, 341 (2005). Congress could have provided for adders for transmission owners "that elect to join" or "choose to join." But it did not do so. Similarly, Congress could have suggested this discretion by stating that FERC "may" (not "shall") "provide for incentives" to transmission owners that join RTOs. Again, it did not do so. This Court should adhere to the statute that Congress actually enacted.

The broader statutory context of Section 219 confirms that Congress intended the adder to be available to all utilities that are RTO members. As discussed above, the purpose of Section 219 was to encourage investment in transmission infrastructure to improve the efficiency and reliability of the interstate grid. Congress' goal in providing the adder was not to encourage RTO membership for

its own sake, but instead to give utilities that belong to RTOs an additional financial incentive to channel their capital to "new investment in transmission facilities" and to foster "capital investment in the enlargement, improvement, maintenance, and operation of all facilities for the transmission of electric energy in interstate commerce, regardless of the ownership of the facilities." 16 U.S.C. § 824s(b)(1)-(2).[19]  Investing in transmission is the behavior Congress sought to induce, and it did so by seeking to provide RTO members "a return on equity that attracts new investment in transmission facilities." *Id.* § 824s(b)(2).

FERC's position would frustrate that congressional goal.  Petitioners are the three largest transmission owners in California.  They are exactly the type of entities to whom Congress sought to provide incentives to invest in new transmission, including by providing an ROE sufficient to attract that investment.  Yet under FERC's interpretation, California can force FERC to reduce the Petitioners' ROE, and eliminate their extra incentive to invest in transmission, simply by passing a state

---

[19] *See also, e.g.*, *Int'l Transmission Co. v. FERC*, 988 F.3d 471, 473 (D.C. Cir. 2021) (noting "Congress legislated in 2005 against the backdrop of declining investment in transmission infrastructure and increasing electric load," and it "intended the incentive-based rate treatments to help alleviate that problem by encouraging investments in transmission infrastructure, thereby improving the transmission system's capacity and reliability" (citation omitted)); *SDG&E v. FERC*, 913 F.3d 127, 130 (D.C. Cir. 2019) ("In Congress's view, because such a rate-treatment rule would enable needed upgrades to infrastructure on which reliable and efficient electric service depends, it would ultimately benefit consumers, even as it also cost them.").

law purporting to mandate participation in an RTO that the utilities already had joined.

Not only does FERC's interpretation contravene the statutory text and undermine Congress' goal, but it also would effectively delegate an aspect of the federal rate framework to state commissions or state legislatures. Indeed, Section 362(c) applies only to the three utilities subject to the 1998 Transfer Decision—*i.e.*, to the three Petitioners here. But there are many other California transmission owners who are members of CAISO and who, under the logic of FERC's decision, would remain eligible for the RTO adder. *See Viridon Cal., LLC*, 186 FERC ¶ 61,143 at PP54-57 (2024). The consequence is an uneven playing field for investment. An investor considering whether to invest an additional dollar in transmission in California will have an incentive to invest that dollar through one of the other California transmission owners rather than Petitioners. But there is no reason to believe that Congress—which tasked FERC with exclusive authority to set transmission rates and directed that such rates cannot be discriminatory, 16 U.S.C. § 824s(d)—would have wanted to allow states to use their laws to require FERC to favor certain RTO members over others. *Cf. Dayton Power & Light Co.*, 176 FERC ¶ 61,025, Chatterjee Dissent at P2 n.4 (2021) ("[P]ermitting some RTO/ISO members to receive the RTO adder, while prohibiting other members from receiving that same incentive, creates an uneven playing field in the competition for

55

investment capital.").  Once again, Congress' goal was to promote efficient and robust investment in transmission facilities, and that goal is thwarted by tilting the playing field in favor of some transmission owners and against others, even though all belong to the same RTO.

### B.    FERC's Contrary Reasoning Is Unpersuasive.

The Rehearing Order offers barely any textual argument in support of the voluntariness requirement.  FERC's only textual argument draws on the word "incentive."  FERC suggests that "incentive" must require voluntary membership because there would be no need to provide "incentives" for behavior that is legally required.  *See* ER-13 (Rehearing Order P24).  But the behavior Congress is seeking to induce is investment in transmission infrastructure.  *See* 16 U.S.C. § 824s(b)(1)-(2).  Congress particularly wanted to promote transmission investment by utilities that belonged to RTOs because RTOs coordinate transmission planning and operations across a broad area, and therefore are well-situated to "benefit[] consumers by ensuring reliability and reducing the cost of delivered power by reducing transmission congestion."  *Id.* § 824s(a); *see also supra* at 8-9 (discussing Order No. 2000).  But a utility does not necessarily invest any more in transmission facilities just because it joins an RTO.  Congress' overarching goal was to induce more transmission investment.  And that is why it chose to give the "incentive" of

an increased ROE to "each" utility "that joins" an RTO—to encourage *all* RTO members to invest more capital in transmission, regardless of why they joined.

At bottom, FERC's justification for the voluntariness requirement rests not on the text or context of Section 219, but instead on Order No. 679 and this Court's decision in *CPUC I*. *See, e.g.*, ER-8 (Rehearing Order P15) ("[W]e continue to find that PG&E does not qualify for the RTO Adder" because "Order No. 679, issued pursuant to FPA section 219 and as interpreted in [*CPUC I*] requires a showing of voluntary membership in a Transmission Organization."). But neither authority can rescue FERC and overcome Section 219(c)'s clear text and context.

Beginning with Order No. 679, its requirements are irrelevant if they are inconsistent with the statute upon which Order No. 679 is based. So FERC cannot defend its interpretation of the statute by pointing to a regulation promulgated to implement the statute. *Loper Bright*, 144 S. Ct. at 2263 ("When the best reading of a statute is that it delegates discretionary authority to an agency, the role of the reviewing court under the APA is, as always, to independently interpret the statute and effectuate the will of Congress subject to constitutional limits.").

In any event, however, FERC makes far too much of the isolated line in Order No. 679 that RTO membership is "*generally* voluntary." Order No. 679, 116 FERC ¶ 61,057 at P331. Even on its own terms, that language recognizes that the adder could be awarded to entities that may not be voluntary members in some instances.

57

Notably, the examples FERC provides for when a utility is *not* free to leave an RTO are "utilities that joined RTOs or ISOs because of merger conditions or market-based rate requirements," *id.* at P331 n.180—*i.e.*, commitments to which the utility voluntary bound itself. Order No. 679 says nothing at all about state participation mandates—unsurprisingly so, given Congress' express direction that RTO membership should be voluntary.

Moreover, if FERC's inference from the phrase "generally voluntary" were correct, it would make no sense for Order No. 679 to have rejected comments "assert[ing] that the incentive should not apply where a transmission owner is ordered to join a RTO/ISO by statute." Order No. 679, 116 FERC ¶ 61,057 at P316. Nor would it make sense for FERC to have said in Order No. 679-A that it "affirm[s] the finding in the Final Rule that the incentive applies to all utilities joining transmission organizations." Order No. 679-A, 117 FERC ¶ 61,345 at P86. Indeed, FERC directly stated on rehearing that the "consumer benefits, including reliability and cost benefits, provided by Transmission Organizations are well documented," and the "best way to ensure those benefits are spread to as many consumers as possible is to provide an incentive that is *widely available* to member utilities." *Id.* (emphasis added).

As for *CPUC I*, FERC cannot rely on that decision to sidestep the plain meaning of Section 219(c), either. That decision did not consider or address the

58

consistency of Order No. 679 with Section 219(c).  Nor could it have: the parties did not raise arguments about the statutory text and instead disputed only the meaning of Order No. 679.  And *CPUC I* held only that FERC had failed to provide an adequate explanation for why voluntariness was not required in light of its other prior policy.  *CPUC I*, 879 F.3d at 977-79.  In other words, this Court did *not* conclude that FERC could never award an adder to a utility whose participation in an RTO was mandated—only that it must provide a reasoned explanation for doing so.  *Id.* at 978-79.

Order No. 679 and *CPUC I* are thus beside the point.  This case is about the meaning of Section 219(c).  By adopting a voluntariness requirement that conflicts with the text and structure of Section 219, FERC has acted contrary to law.

### C.  Even Assuming Section 219 Includes a Voluntariness Requirement, PG&E Did "Join" Voluntarily.

Even if the Court nonetheless believes that Section 219(c) contains an implicit voluntariness requirement, the text of the statute focuses that requirement on the voluntariness of the decision to *join*.  *See* 16 U.S.C. § 824s(c) (providing the adder to each utility "that joins" an RTO).  Here, it is undisputed that PG&E voluntarily joined CAISO in 1998.  Indeed, *CPUC II* confirms that the state laws in effect in 1998 encouraged but did not require PG&E to join CAISO.  29 F.4th at 466 ("As FERC noted, California 'point[s] to no provision in the California Code that mandates [CAISO] membership.'  The statutory provisions that California relies on

merely directed the CPUC to facilitate the creation of CAISO and encourage utilities to join." (citations omitted)). It is also undisputed that even though PG&E needed CPUC approval to join CAISO at that time, such approval does not negate the voluntariness of the decision to join.

California enacted AB 209 in 2022, more than twenty years after PG&E joined CAISO. This after-the-fact law has no bearing on the voluntariness of PG&E's decision to join CAISO in 1998. Section 219(c)'s focus on the moment of joinder forecloses California's attempt to belatedly strip PG&E of the adder.

## CONCLUSION

The Court should grant the petitions and vacate the orders under review.

September 11, 2024

Respectfully submitted,

/s/ *Matthew E. Price*

Charles Middlekauff
PACIFIC GAS AND ELECTRIC COMPANY
300 Lakeside Drive
Oakland, CA 94612
Telephone: (650) 766-9147
charles.middlekauff@pge.com

Rebecca Furman
SOUTHERN CALIFORNIA EDISON
COMPANY
2244 Walnut Grove Ave.
Rosemead, CA 91770
Telephone: (626) 302-3475
rebecca.furman@sce.com

Ross Fulton
SAN DIEGO GAS & ELECTRIC COMPANY
8330 Century Park Court
San Diego, CA 92123
Telephone: (858) 654-1861
rfulton@sdge.com

Matthew E. Price
Arjun R. Ramamurti
JENNER & BLOCK LLP
1099 New York Ave. NW Suite 900
Washington, DC 20001
Telephone: (202) 639-6000
mprice@jenner.com

Laurie Edelstein
JENNER & BLOCK LLP
525 Market Street, 29th Floor
San Francisco, CA 94105
Telephone: (628) 267-6800
ledelstein@jenner.com

*Counsel for Petitioners Pacific Gas and Electric Company, Southern California Edison Company, and San Diego Gas & Electric Company*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s) 24-2527, 24-3786**

I am the attorney or self-represented party.

**This brief contains 13,957 words,** excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ X ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** _/s/ Matthew E. Price_      **Date** September 11, 2024

## CERTIFICATE OF SERVICE

I certify that on September 11, 2024, I electronically filed the foregoing document with the clerk of the court for the United States Court of Appeals for the Ninth Circuit, using the CM/ECF system.  Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

Dated:  September 11, 2024

/s/ *Matthew E. Price*
Matthew E. Price
JENNER & BLOCK LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
(202) 639-6000
mprice@jenner.com